

**U.S. Department of Justice**

*United States Attorney*
*District of Maryland*

---

Rachel Miller Yasser
Assistant United States Attorney
Rachel.Yasser@usdoj.gov

Suite 400
36 S. Charles Street
Baltimore, MD 21201-3119

DIRECT: 410-209-4922
MAIN: 410-209-4800
FAX: 410-962-0716

July 21, 2014

FILED _____ ENTERED
LOGGED _____ RECEIVED

SEP 03 2014

AT BALTIMORE
CLERK U.S. DISTRICT COURT
DISTRICT OF MARYLAND
BY _____ DEPUTY

Russell A. Neverdon, Sr., Esq.
Law Office of Russell A. Neverdon, Sr.
201 N. Charles Street, Suite 1900
Baltimore, Maryland 21201

Re:  *United States v. Ryan Gladden, GLR-13-0229*

Dear Mr. Neverdon:

This letter, together with the Sealed Supplement, confirms the plea agreement which has been offered to the Defendant by the United States Attorney's Office for the District of Maryland ("this Office"). If the Defendant accepts this offer, please have him execute it in the spaces provided below. If this offer has not been accepted by August 4, 2014, it will be deemed withdrawn. The terms of the agreement are as follows:

<u>Offense of Conviction</u>

1.    The Defendant agrees to plead guilty to Count One of the Superseding Indictment now pending against him, which charges him with Racketeering Conspiracy, in violation of 18 U.S.C. 1962(d). The Defendant admits that he is, in fact, guilty of that offense and will so advise the Court.

<u>Elements of the Offense</u>

2.    The elements of the offense to which the Defendant has agreed to plead guilty, and which this Office would prove if the case went to trial, are as follows:

<u>Racketeering Conspiracy</u>

The defendant agreed to participate (1) in an enterprise (2) that was engaged in or affected interstate commerce and (3) that engaged in a pattern of racketeering activity.

1

## Penalties

3.      The maximum sentence provided by statute for the offense to which the Defendant is pleading guilty is as follows: twenty years imprisonment, a fine of $250,000 and a period of supervised release of three (3) years In addition, the Defendant must pay $100.00 as a special assessment pursuant to 18 U.S.C. § 3013, which will be due and should be paid at or before the time of sentencing.   This Court may also order him to make restitution pursuant to 18 U.S.C. §§ 3663, 3663A, and 3664.[1]   If a fine or restitution is imposed, it shall be payable immediately, unless, pursuant to 18 U.S.C. § 3572(d), the Court orders otherwise.   The Defendant understands that if she serves a term of imprisonment, is released on supervised release, and then violates the conditions of his supervised release, his supervised release could be revoked - even on the last day of the term - and the Defendant could be returned to custody to serve another period of incarceration and a new term of supervised release.   The Defendant understands that the Bureau of Prisons has sole discretion in designating the institution at which the Defendant will serve any term of imprisonment imposed.

## Waiver of Rights

4.      The Defendant understands that by entering into this agreement, he surrenders certain rights as outlined below:

a.      If the Defendant had persisted in his plea of not guilty, he would have had the right to a speedy jury trial with the close assistance of competent counsel.   That trial could be conducted by a judge, without a jury, if the Defendant, this Office, and the Court all agreed.

b.      If the Defendant elected a jury trial, the jury would be composed of twelve individuals selected from the community. Counsel and the Defendant would have the opportunity to challenge prospective jurors who demonstrated bias or who were otherwise unqualified, and would have the opportunity to strike a certain number of jurors peremptorily.   All twelve jurors would have to agree unanimously before the Defendant could be found guilty of any count.   The jury would be instructed that the Defendant was presumed to be innocent, and that presumption could be overcome only by proof beyond a reasonable doubt.

c.      If the Defendant went to trial, the government would have the burden of proving the Defendant guilty beyond a reasonable doubt.   The Defendant would have the right to confront and cross-examine the government's witnesses.   The Defendant would not have to present any defense witnesses or evidence whatsoever.   If the Defendant wanted to call witnesses in his defense, however, he would have the subpoena power of the Court to compel the witnesses to attend.

---

[1]      Pursuant to 18 U.S.C. § 3612, if the Court imposes a fine in excess of $2,500 that remains unpaid 15 days after it is imposed, the Defendant shall be charged interest on that fine, unless the Court modifies the interest payment in accordance with 18 U.S.C. § 3612(f)(3).

d.      The Defendant would have the right to testify in his own defense if he so chose, and he would have the right to refuse to testify.  If he chose not to testify, the Court could instruct the jury that they could not draw any adverse inference from his decision not to testify.

e.      If the Defendant were found guilty after a trial, he would have the right to appeal the verdict and the Court's pretrial and trial decisions on the admissibility of evidence to see if any errors were committed which would require a new trial or dismissal of the charges against his.  By pleading guilty, the Defendant knowingly gives up the right to appeal the verdict and the Court's decisions.

f.      By pleading guilty, the Defendant will be giving up all of these rights, except the right, under the limited circumstances set forth in the "Waiver of Appeal" paragraph below, to appeal the sentence.  By pleading guilty, the Defendant understands that he may have to answer the Court's questions both about the rights he is giving up and about the facts of his case. Any statements the Defendant makes during such a hearing would not be admissible against him during a trial except in a criminal proceeding for perjury or false statement.

g.      If the Court accepts the Defendant's plea of guilty, there will be no further trial or proceeding of any kind, and the Court will find him guilty.

h.      By pleading guilty, the Defendant will also be giving up certain valuable civil rights and may be subject to deportation or other loss of immigration status. The Defendant recognizes that if he is not a citizen of the United States, pleading guilty may have consequences with respect to his immigration status.  Under federal law, conviction for a broad range of crimes can lead to adverse immigration consequences, including automatic removal from the United States.  Removal and other immigration consequences are the subject of a separate proceeding, however, and the Defendant understands that no one, including his attorney or the Court, can predict with certainty the effect of a conviction on immigration status. Defendant nevertheless affirms that he wants to plead guilty regardless of any potential immigration consequences.

## Advisory Sentencing Guidelines Apply

5.      The Defendant understands that the Court will determine a sentencing guidelines range for this case (henceforth the "advisory guidelines range") pursuant to the Sentencing Reform Act of 1984 at 18 U.S.C. §§ 3551-3742 (excepting 18 U.S.C. §§ 3553(b)(1) and 3742(e)) and 28 U.S.C. §§ 991 through 998.  The Defendant further understands that the Court will impose a sentence pursuant to the Sentencing Reform Act, as excised, and must take into account the advisory guidelines range in establishing a reasonable sentence.

## Factual and Advisory Guidelines Stipulation

6.      This Office and the Defendant understand, agree and stipulate to the Statement of Facts set forth in Attachment A hereto, which this Office would prove beyond a reasonable doubt, and to the following applicable sentencing guidelines factors:

a)     The base offense level for a violation of 18 U.S.C. § 1962(d) is driven by the greater of nineteen or the offense levels applicable to the underlying racketeering activity. U.S.S.G. § 2E1.1(a)(2); Application Note 1. The relevant offense conduct incorporates all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity that occurred during the commission of the offense of conviction under the U.S. Sentencing Guidelines.

b)     In this case, those acts include drug trafficking, illegal guns, and aggravated assaults.    Pursuant to U.S.S.G. 2E1.1(a)(2), Application Note 1, the grouping rules apply to the underlying racketeering activity.

d)     Group 1: Firearms: Because the defendant has a prior felony conviction for a crime of violence, the base offense level is 20, based on the reasonably foreseeable activity of illegal gun possession. U.S.S.G. § 2K2.1(a)(4)(A). There is a four (4) level increase because firearms were possessed in connection with another felony offense (i.e., the RICO conspiracy). Thus, the resulting offense level for Group One is 24.

e)     Group 2: The base offense level for the reasonably foreseeable activity of aggravated assault is 14 (U.S.S.G. 2A2.2). Because Gladden knows dangerous weapons are used, there is a 4 level increase. The guidelines are increased by an additional 3 levels because the victims sustained bodily injury. Thus, the resulting offense level is 21. (Group 2)

f)     Group 3: Drug Trafficking (marijuana, ecstasy, valium and other controlled prescription drugs). The guidelines for drug trafficking are driven by the drug quantity which is difficult to estimate in this case. The government agrees the likely offense level, in any event, would be less than required to have an effect on the adjusted offense level under Chapter 3 Multiple Count rules.

g)     Under U.S.S.G. 3D1.4, count as one Unit the Group with the highest offense level (24) and one additional Unit for the that is equally serious or from 1 to 4 levels less serious. Thus, the adjusted offense level is 26.

h)     There is a three (3) level increase because the defendant was a leader/organizer of criminal activity. U.S.S.G. § 3B1.1. Therefore, the adjusted offense level is 29.

i)     This Office does not oppose a two-level reduction in the Defendant's adjusted offense level, based upon the Defendant's apparent prompt recognition and affirmative acceptance of personal responsibility for his criminal conduct. This Office agrees to make a motion pursuant to U.S.S.G. § 3E1.1(b) for an additional one-level decrease in recognition of the Defendant's timely notification of his intention to plead guilty. This Office may oppose any adjustment for acceptance of responsibility if the Defendant (a) fails to admit each and every item in the factual stipulation; (b) denies involvement in the offense; (c) gives conflicting statements about his involvement in the offense; (d) is untruthful with the Court, this Office, or the United

States Probation Office; (e) obstructs or attempts to obstruct justice prior to sentencing; (f) engages in any criminal conduct between the date of this agreement and the date of sentencing; or (g) attempts to withdraw his plea of guilty.   **Thus, the total adjusted offense level for Count One is 26.**

7.      The Defendant understands that there is no agreement as to his criminal history or criminal history category, and that his criminal history could alter his offense level if he is a career offender or if the instant offense was a part of a pattern of criminal conduct from which he derived a substantial portion of his income.

8.      This Office and the Defendant agree that with respect to the calculation of the advisory guidelines range, no other offense characteristics, sentencing guidelines factors, potential departures or adjustments set forth in the United States Sentencing Guidelines will be raised or are in dispute.

Obligations of the United States Attorney's Office

9.      At the time of sentencing, this Office will recommend a reasonable sentence pursuant to 18 U.S.C. § 3553(a).

10.     The parties reserve the right to bring to the Court's attention at the time of sentencing, and the Court will be entitled to consider, all relevant information concerning the Defendant's background, character and conduct.

Waiver of Appeal

11.     In exchange for the concessions made by this Office and the Defendant in this plea agreement, this Office and the Defendant waive their rights to appeal as follows:

a.      The Defendant knowingly waives all right, pursuant to 28 U.S.C. § 1291 or otherwise, to appeal the Defendant's conviction.

b.      The Defendant and this Office knowingly waive all right, pursuant to 18 U.S.C. § 3742 or otherwise, to appeal whatever sentence is imposed (including the right to appeal any issues that relate to the establishment of the advisory guidelines range, the determination of the defendant's criminal history, the weighing of the sentencing factors, and the decision whether to impose and the calculation of any term of imprisonment, fine, order of forfeiture, order of restitution, and term or condition of supervised release).

c.      Nothing in this agreement shall be construed to prevent the Defendant or this Office from invoking the provisions of Federal Rule of Criminal Procedure 35(a), or from appealing from any decision thereunder, should a sentence be imposed that resulted from arithmetical, technical, or other clear error.

d.      The Defendant waives any and all rights under the Freedom of Information

Act relating to the investigation and prosecution of the above-captioned matter and agrees not to file any request for documents from this Office or any investigating agency.

## Obstruction or Other Violations of Law

12.     The Defendant agrees that he will not commit any offense in violation of federal, state or local law between the date of this agreement and his sentencing in this case.  In the event that the Defendant (i) engages in conduct after the date of this agreement which would justify a finding of obstruction of justice under U.S.S.G. § 3C1.1, or (ii) fails to accept personal responsibility for his conduct by failing to acknowledge his guilt to the probation officer who prepares the Presentence Report, (iii) moves to withdraw his guilty plea or (iv) commits any offense in violation of federal, state or local law, then this Office will be relieved of its obligations to the Defendant as reflected in this agreement.  Specifically, this Office will be free to argue sentencing guidelines factors other than those stipulated in this agreement, and it will also be free to make sentencing recommendations other than those set out in this agreement.  As with any alleged breach of this agreement, this Office will bear the burden of convincing the Court of the Defendant's obstructive or unlawful behavior and/or failure to acknowledge personal responsibility by a preponderance of the evidence.  The Defendant acknowledges that he may not withdraw his guilty plea because this Office is relieved of its obligations under the agreement pursuant to this paragraph.

## Court Not a Party

13.     The Defendant expressly understands that the Court is not a party to this agreement.  In the federal system, the sentence to be imposed is within the sole discretion of the Court.  In particular, the Defendant understands that neither the United States Probation Office nor the Court is bound by the stipulation set forth above, and that the Court will, with the aid of the Presentence Report, determine the facts relevant to sentencing.  The Defendant understands that the Court cannot rely exclusively upon the stipulation in ascertaining the factors relevant to the determination of sentence.  Rather, in determining the factual basis for the sentence, the Court will consider the stipulation, together with the results of the presentence investigation, and any other relevant information.  The Defendant understands that the Court is under no obligation to accept this Office's recommendations, and the Court has the power to impose a sentence up to and including the statutory maximum stated above.  The Defendant understands that if the Court ascertains factors different from those contained in the stipulation set forth above, or if the Court should impose any sentence up to the maximum established by statute, the Defendant cannot, for that reason alone, withdraw his guilty plea, and will remain bound to fulfill all of his obligations under this agreement.   The Defendant understands that neither the prosecutor, his counsel, nor the Court can make a binding prediction, promise, or representation as to what guidelines range or sentence the Defendant will receive.   The Defendant agrees that no one has made such a binding prediction or promise.

## Entire Agreement

14.     This letter supersedes any prior understandings, promises, or conditions between

this Office and the Defendant and, together with the Sealed Supplement, constitutes the complete plea agreement in this case.  The Defendant acknowledges that there are no other agreements, promises, undertakings or understandings between the Defendant and this Office other than those set forth in this letter and the Sealed Supplement and none will be entered into unless in writing and signed by all parties.

If the Defendant fully accepts each and every term and condition of this agreement, please sign and have the Defendant sign the original and return it to me promptly.

Very truly yours,

Rod J. Rosenstein
United States Attorney

By: _____

Rachel M. Yasser
Sandra Wilkinson
Assistant United States Attorneys

I have read this agreement, including the Sealed Supplement, and carefully reviewed every part of it with my attorney.  I understand it, and I voluntarily agree to it.  Specifically, I have reviewed the Factual and Advisory Guidelines Stipulation with my attorney, and I do not wish to change any part of it.  I am completely satisfied with the representation of my attorney.

8/30/14
Date

Ryan Gladden

I am Mr. Gladden's attorney.  I have carefully reviewed every part of this agreement, including the Sealed Supplement with him.  He advises me that he understands and accepts its terms.  To my knowledge, his decision to enter into this agreement is an informed and voluntary one.

8/30/14
Date

Russell A. Neverdon, Sr., Esq.

## ATTACHMENT A:
## STIPULATED FACTS

*If this matter had proceeded to trial, the government would have proven the following facts beyond a reasonable doubt. The parties agree that the following facts do not encompass all of the facts that would have been proven had this matter proceeded to trial.*

Ryan Gladden, a/k/a "Fats," age 26, was a resident of Wilkes Barre, Pennsylvania who played football on a semi-professional team in Scranton, Pennsylvania. He is formerly of Baltimore City and Randallstown, Maryland.

Gladden has been a member of the Bloods gang since approximately 2006, and he associates with the following Blood gang members operating out of Howard County, Maryland: Anthony Preston, a/k/a "40" or "Tone;" Giovanni Wright, a/k/a "G;" Michael Johnson, a/k/a "Ace;" and others. Gladden is a member of the "Swann" set, a sub-group of the Bloods, along with Preston, Wright, Johnson, and others. Preston and Gladden joined the Swanns together in approximately 2006, with Preston later achieving the rank of "O.Y.G" or "O.G.," ("Original Young Gangster" or "Original Gangster"), terms used for a leader in the gang with authority over other Bloods members. At times relevant, Gladden was referred to as Johnson's "Big Big Homie" and Preston's "Big Homie," additional terms used for a leader in the gang with authority over other Bloods members. Gladden was referred to as such in social media and phone contacts, and by cooperating witnesses.

The Bloods is a national criminal street gang and a racketeering "enterprise," that is, a group of individuals associated in fact that engage in, and the activities of which affect, interstate and foreign commerce, and an ongoing organization whose members function as a continuing unit for the common purpose of achieving the objectives of the enterprise. Members of the Bloods frequently engage in criminal activity, including, but not limited to, aggravated assaults, assaults, drug trafficking, robberies, burglaries, obstruction of justice, and threatening and intimidating of witnesses. Bloods are required to commit acts of violence to maintain membership and discipline within the gang and against rival gangs. Participation in criminal activity by a member, particularly violent acts directed at rival gangs or as directed by the gang leadership, increase the respect accorded to that member, result in that member's maintaining or increasing his position in the gang, and could result in a promotion to a leadership position. The Bloods often generate income through drug trafficking and commit other criminal activities to further the gang and the reputation of the gang.

The Bloods are made up of various sub-groups known as "Sets" between which some differences can and do exists. Bloods Sets operate independently of each other, and are currently located in almost every state in the United States. Several sets or cliques relevant to Howard County have been identified to include: the "Swanns," "400 Tree Topp," "Tree Top Piru (TTP)." Bloods members in Howard County may belong to different "Sets," or sub groups, and ultimately report to leadership based in the surrounding cities, but belong to one criminal enterprise, and operate as such. Bloods from different "Sets" residing in Howard County form an alliance to further the mission of the Bloods gang.

tells Gladden that "They caught that nigga with the vest, everything, shells, fully loaded clips" Gladden asked if someone ratted on Mongo. The male responded "Yo, that nigga was dealing with motha fuckers man. I didn't even know man who, man…he had a 100 niggas he was fuckin with." Both Gladden and the male expressed concern that Mongo would be forced to cooperate because it is his "third strike" and "not to mention he was running with the bloods in the jail so all that shit gonna come up, all that, man that shit is crazy." Gladden said, "I'm sorry this shit is crazy cause' the nigga always wants to stick to G code for real yo but that shit hard now he got mother fucking daughter like come on man. " Gladden meant here that it would be hard for Mongo to stick to the "G" code (not to cooperate with police) because he ("Mongo") had a young child. Gladden noted he might need to obtain a new phone as a result of the arrest and investigation of Mongo. Following Gladden's arrest on May 8, 2013, he admitted to buying drugs from Mongo on 6 to 7 occasions.

On April 20, 2013, Preston was captured on video assaulting a former gang member with a knife and mace in a 7-Eleven convenience store. Preston also hit the girlfriend of the gang member in her face and attempted to spray her with mace. Citizens, including a young child, were injured by the mace.

On April 21, 2013, Gladden and Preston exchanged a series of text messages regarding the commission of acts of violence against another. Both Preston and Gladden replaced the letter "c" with the letter "k" in common words – indicative of Bloods membership because "c" is the first letter of the Crips, a rival gang.

| PRESTON: | Ima fuk him up too |
|---|---|
| GLADDEN: | He in Dc I kan get his location |
| PRESTON: | Do that. |

Preston also reported the 7-11 incident to Gladden on the morning of April 22, 2013. Preston advised Gladden that he wanted to kill that "nigga" and that the "fucked up thing is that I had just point the fucking joint" away….I  probably would have smoked for real." Preston was referring to not having his gun and that if he would have had his gun, he would have killed the man.

On April 22, 2013, Gladden told another Bloods member about Preston's assault: "I guess the nigga had gave uh Forty (40) [Preston's nickname] the pistol without giving him platinum and shit. This nigga… went to go get it back from him, he said the shit wasn't …firing right so….he told Forty to give him some bread. Forty like 'I not giving you no bread' … like nah nigga you ain't gonna play that card, for real….. this nigga 40 goes …in the 711, taps the nigga on the shoulder and says hey uh 'this was you were talking about and shit' and maced the nigga, son….Yeah he maced the son and beat the shit out of him [Laughs]…. "

The wiretap on Gladden's line also yielded evidence of Gladden's involvement in drug trafficking in Pennsylvania to include marijuana and prescription pain pills. For example, on April 9, 2013, Gladden engaged in a series of text messages with an unknown male ("UM") brokering the purchase and sale of Oxycodone, as follows:

Gladden was identified as member of the Bloods operating in Howard County, Maryland as the result of a long term investigation conducted by the ATF and the Howard County Police Department.   The investigation included four court ordered wiretaps on gang members' cellular telephones to include Gladden, Wright and Preston.

Gladden knew of various crimes of violence committed, or being planned by gang members, using guns and other dangerous weapons. He was also involved in drug trafficking.

On February 21, 2013, Wright asked Preston to determine the status of a potential Bloods member who was causing problems with members or associates of Preston's set.  According to Wright, this individual was claiming to be Blood, so Wright turned to Preston to inquire if this individual was in fact a member of the Bloods gang.  Both Wright and Preston agreed that taking violent action against an individual could cause problems if he was "family," a reference to being a member of the Bloods.  Preston consulted immediately with Gladden, who agreed to check on the status of this potential Bloods member.  Toll records indicate that Gladden then called a Bloods member in Baltimore City.  Following this inquiry, Gladden contacted Preston and stated that that he checked with one of the "Big Homies," who had the "line-up" before Gladden, and was unable to verify that the individual was a member of the Bloods.  Gladden stated "I don't know who he is, and, and, and the nigger, the nigger and one of these big homies, that **had the lineup before me,** the lineup before me don't know who he is, for real.  You feel me.  We know each and every person in both line-ups for real, you feel me.  He know who he brought home and who I brought on, so, I don't, I don't know yet.  So, I mean nigga said straight up like he just told me to tell, to tell your people **go ahead and do what they do then**.."  The two men concluded the conversation, each stating a common Bloods salutation: "woo woo."

After the Gladden call, Preston called Wright and instructed "niggas saying go ahead, you feel me, and do whatever, like go ahead, do your thing, you feel me, but niggas also like, you feel me, like, gotta make sure too.  ..... I'm gonna leave it up to you, you do what you think is best."  Wright responded "Alright, that's a bet......Alright, blood."  Preston said, "Love you boy, woo woo."

It is unknown from the wiretap whether or not the man was assaulted as a result of the go ahead by Gladden but clearly an attack was anticipated by the conversations among the 3 gang members.  On February 21, 2013, Wright was surveilled driving around while captured on the wiretap discussing the fact that he was looking for the potential victim with his "joint" (gun).

On March 14, 2013, Gladden was intercepted discussing gang business.  The two men discuss "Hood" who Gladden reported got 25 years plus life imprisonment for "conspiracy of murder for real 'cause a nigga, two (2) little niggas in there, under, under my hood ....they killed a little nigga out of Woodlawn for real. Stabbed him up and...then they tried to say um, Hood the one who gave them the gr, and [U/I] whole time he was already [U/I].  You feel me?.... that nigga KP gave them the nigga the green light for real, but they turned it on Hood and shit."  The reference to "green light" is a common gang term to mean an order to kill or assault.

On April 4, 2013, Gladden and an unknown male discuss a recent arrest of a number of associates in Pennsylvania including "Mongo" (later identified by law enforcement).  The male

| Gladden: | txt u when I get ur money |
| Gladden: | ok what mboxes did you get |
| UM: | im here no idk yet hopefully blue |
| UM: | u know anyone looking?  N there lite blue |
| Gladden | which one and ima text my mans now |
| UM: | 30s m box lite blue lol |
| UM: | no less than 25 a pop homie |

Gladden immediately thereafter sends a text to another person stating "Brow I got lite blue mbox 30s." Two days later, on April 11, 2013, Gladden also sent a text stating that "30s on deck."    The government contends that Gladden's slang was consistent with the sale of Oxycodone.   In his post arrest statement Gladden stated he did not sell Oxy directly but introduced people. He admitted to selling drugs a few days before his arrest.  He also stated he sold Percocet's for $25 per 30mg pill.

On the evening of April 11, 2013, Gladden made a telephone call to a man requesting the use of his Hi-Point firearm because of an argument he just had with a man named Crawford. The male suggested that Gladden reach out to another man to get his .32 caliber handgun.

On May 8, 2013, Gladden was arrested.  He waived his *Miranda* rights and answered questions but was not completely truthful about his involvement in criminal activity. He minimized his own activity though he admitted to selling drugs and knowledge of guns.

I have read this statement of facts and carefully reviewed it with my attorney.  I acknowledge that it is true and correct.

8/30/14
Date

Ryan Gladden

8/30/14
Date

Russell A. Neverdon, Sr., Esq.